IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>vs.<br><br>NATIONAL MARINE FISHERIES SERVICE; GINA RAIMONDO, U.S. Secretary of Commerce; JANET COIT, Assistant Administrator, NOAA Fisheries,<br><br>Defendants. | Civil No. 23-00306 MWJS-WRP<br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT |

**INTRODUCTION**

In 2014, the National Marine Fisheries Service, known for short as "NMFS," listed twenty coral species found in the Indo-Pacific and Caribbean as threatened under the Endangered Species Act (ESA). NMFS also identified the environmental and human factors threatening the corals' survival. Most significantly, it found that ocean warming, ocean acidification, and disease—all emanating from climate change—posed the highest-level threats. It further found that collection and trade and other local stressors—such as overfishing, water pollution, and habitat degradation—constituted lesser, but still formidable threats.

Section 4(d) of the ESA provides that NMFS "shall" issue regulations it deems "necessary and advisable" to provide for the conservation of threatened species. 16

U.S.C. § 1533(d).  Yet despite NMFS's 2014 findings that the twenty corals are at rising

risk of extinction, NMFS has taken no regulatory action under Section 4(d) to address

the factors that, by its own lights, threaten that result.

Faced with this agency inaction, the Center for Biological Diversity (the Center)

petitioned NMFS to promulgate Section 4(d) regulations to advance the threatened

coral species' conservation.  After NMFS denied the petition in a three-page letter, the

Center brought this suit, asserting that the denial was arbitrary and capricious.  Now

before the Court are the parties' cross-motions for summary judgment.

In reviewing NMFS's denial of the Center's petition for rulemaking, the Court's

role is limited to assessing whether the agency considered the issues presented and

offered reasoned grounds for its decision.  To the extent NMFS has done so, the Court

may not second guess its determinations.  But even under this highly deferential

standard of review, two facets of NMFS's denial letter fall short:  NMFS offered no

reasoned explanation for declining to adopt regulations to protect the threatened coral

species from their gravest threat, climate change.  And for one set of the threatened

species, the Caribbean corals, NMFS offered no reasoned explanation for declining to

adopt regulations addressing localized threats.  Granted, NMFS's letter did offer some

conclusory assertions—namely, that the requested regulations would have a "limited"

effect, that NMFS is taking more effective measures to address threats, and that such

regulations would take resources away from higher priorities—but it offered no *reasons*

2

for why NMFS reached these conclusions.  And the agency thus failed to demonstrate that it reached these conclusions through reasoned decision making.  As to these two aspects of the denial letter, therefore, the Court cannot affirm the agency's conclusions.

This ruling is, to be clear, a narrow one:  the Court does not *require* NMFS to adopt Section 4(d) regulations to address climate change or, for the threatened Caribbean corals, localized threats.  The agency may well have appropriate reasons for declining to do so—including, conceivably, reasons hinted at in NMFS's denial letter. But before the Court can defer to the agency's reasons, the agency must adequately share what those reasons are.  Because it did not do so here, the Center's summary judgment motion is GRANTED IN PART AND DENIED IN PART, and this matter is remanded to NMFS for further consideration of the Center's petition.

## BACKGROUND

### A.    The Endangered Species Act Legal Framework

At the time of its passage, the Endangered Species Act (ESA) was "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).  It was enacted "'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved,' and 'to provide a program for the conservation of such species.'"  *Id.* (cleaned up) (quoting 16 U.S.C. § 1531(b)).

Under Section 4(d) of the ESA, NMFS "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. § 1533(d).  That goal—"conservation"—is defined broadly as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  *Id*. § 1532(3).  And NMFS "shall" promulgate the regulations it concludes are "necessary and advisable" to serve that ambitious goal.  *Id*. § 1533(d).

One form of regulation that may at times be necessary and advisable is the set of prohibitions found in Section 9 of the ESA.  These prohibitions automatically apply to endangered species, and Section 4(d) grants NMFS discretion to apply them to threatened ones as well.  *Id*. (providing that NMFS "may by regulation prohibit with respect to any threatened species any act prohibited under [Section 9] of this title").  And when Section 9 applies—whether automatically or because of NMFS's exercise of discretion under Section 4(d)—the "import," "export," "take," and "sale" of the covered species, among other actions, is prohibited.  *Id*. § 1538(a)(1)(A), (B), (F); *see also id*. § 1532(19) (defining "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct").

//

//

//

4

B.        **Procedural Background**

1.        **The Center's Petition**

In 2020, the Center petitioned NMFS to promulgate regulations under Section

4(d) of the ESA to provide for the conservation of twenty threatened coral species.  ECF

No. 38-28, at PageID.10905-73 (Administrative Record (AR) at 10759-827).  The corals

included fifteen Indo-Pacific species and five Caribbean species,[1] which NMFS had

listed as threatened on September 10, 2014.  79 Fed. Reg. 53852 (Sept. 10, 2014), ECF No.

30, at PageID.1156-427 (AR at 1016-287).  In the final listing rule, NMFS determined that

the greatest threats to the coral species' survival were ocean warming, disease, and

ocean acidification, all of which are related to climate change.  *Id.* at 53885-86, ECF No.

30, at PageID.1189-90 (AR at 1049-50).  And it identified various moderate-to-low level

threats, such as collection and trade and other localized threats, including overfishing,

water pollution, and habitat degradation.  *Id.*

In its petition, the Center requested that NMFS take two steps to protect the

corals from these threats, each of which the Center contended was necessary and

advisable under Section 4(d).  ECF No. 38-28, at PageID.10905-23 (AR at 10759-77).

---

[1]        Those Indo-Pacific coral species are *Acropora globiceps*, *Acropora jacquelineae*,
*Acropora lokani*, *Acropora pharaonis*, *Acropora retusa*, *Acropora rudis*, *Acropora speciosa*,
*Acropora tenella*, *Anacropora spinosa*, *Euphyllia paradivisa*, *Isopora crateriformis*, *Montipora
australiensis*, *Pavona diffluens*, *Porites napopora*, and *Seriatopora aculeata*.  The Caribbean
coral species are *Dendrogyra cylindrus*, *Orbicella annularis*, *Orbicella faveolata*, *Orbicella
franksi*, and *Mycetophyllia ferox*.

First, it requested that NMFS extend Section 9 of the ESA to the threatened corals to prohibit their collection and trade. *Id.* at PageID.10916-20 (AR at 10770-74). Second, it requested that NMFS promulgate additional Section 4(d) regulations to address the threats posed by climate change—in particular, by reducing greenhouse gas emissions—and by local stressors, such as water pollution, habitat degradation, and overfishing. *Id.* at PageID.10920-23 (AR at 1074-77).

### 2.    NMFS's Denial of the Petition

In a just over three-page letter dated May 5, 2021, NMFS denied the Center's petition and declined to take either requested step. ECF No. 38-35, at PageID.14540-43 (AR at 15262-65). The letter explained that NMFS's decision was based on "information presented in the petition as well as the conservation needs and priorities for the threatened corals." *Id.* at PageID.14541 (AR at 15263). It summarized NMFS's conservation priorities for the species: For the fifteen Indo-Pacific corals, those are "completing a critical habitat designation and engaging with partners to develop a recovery plan." *Id.* And for the five Caribbean corals, priorities also include "completing a critical habitat designation[,] as well as continued coordination of rescue efforts and response to the unprecedented stony coral tissue loss disease" and "continuing to implement the existing recovery plan." *Id.*

In declining to extend Section 9 prohibitions on collection and trade to the threatened corals, NMFS stated that doing so would "provid[e] no meaningful

conservation benefit" and would be difficult to implement due to species identification challenges. *Id.* at PageID.14541-42 (AR at 15263-64). And in denying the request for additional Rule 4(d) protections, NMFS concluded that for Indo-Pacific corals, such regulations would have "limited effectiveness" in addressing other localized threats and the global threats posed by climate change, and that Section 7 interagency consultation and engaging with partners on recovery plans for the corals would be more effective. *Id.* at PageID.14542 (AR at 15264).

### 3. The Center's Suit and the Parties' Cross-Motions for Summary Judgment

The Center filed this lawsuit on July 26, 2023, asserting that NMFS's denial of its petition was arbitrary and capricious in violation of the Administrative Procedure Act (APA). ECF No. 1; *see* 5 U.S.C. § 706(2)(A). The parties have now filed cross-motions for summary judgment. ECF Nos. 44 & 46. Each party contends that the case should be decided in their favor as a matter of law.

The Court held a hearing on the parties' cross-motions for summary judgment on February 6, 2025. ECF No. 50.

### DISCUSSION

### A. Article III Standing

At the outset, the Court must assure itself that it has the authority to hear this matter. Article III of the U.S. Constitution limits federal courts' adjudication powers to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. And a dispute does not

7

count as a constitutional case or controversy if the plaintiff lacks Article III standing—

that is, a concrete stake in the outcome. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581

U.S. 433, 438 (2017). The party bringing an action has the burden to establish that

Article III standing exists. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). And so

here, although NMFS does not contest the Center's constitutional standing, the Court

must nonetheless ensure that the Center has met its burden.

The Center is a "nonprofit corporation dedicated to the preservation of

biodiversity, native species, and ecosystems." ECF No. 1, at PageID.5. In its pleadings,

the Center explained that it has "more than 90,000 members" and that its members and

staff visit, observe, and study the threatened corals for which it seeks protection. *Id.* at

PageID.6. Accordingly, the Center asserts a theory of associational—or

"representational"—standing, under which it can sue on behalf of its own members

even if the organization itself has not suffered an injury. *Fleck & Assocs., Inc. v. City of

Phoenix*, 471 F.3d 1100, 1105 (9th Cir. 2006); *see also* ECF No. 44-1, at PageID.16256

(positing that the Center's members have standing).

More particularly, to establish Article III associational standing, the Center must

establish three elements: (1) that at least one of its members would have standing to sue

in their own right, (2) that the interests at stake are germane to the organization's

purpose, and (3) that neither the claim asserted nor the relief requested requires the

individual members to participate in the suit. *Fleck & Assocs.*, 471 F.3d at 1105-06. To

show the first element of member standing, the Center must demonstrate that at least

one of its members (1) has suffered an injury in fact, (2) that was caused by the

defendant's challenged conduct, and (3) that is likely redressable through a favorable

decision. *Lujan*, 504 U.S. at 560-61. In environmental cases, the "injury in fact"

requirement is satisfied if any member has an adequate "aesthetic or recreational

interest in a particular place, or animal, or plant species and [can show] that that interest

is impaired" by the challenged action. *Ecological Rights Found. v. Pac. Lumber Co.*, 230

F.3d 1141, 1147 (9th Cir. 2000).

Beginning with the organization itself, the Center has set forth a sufficient

connection between its organizational purpose of biodiversity, native species, and

ecosystem preservation and the interests vindicated by this suit—that is, the protection

of threatened corals. *See, e.g.*, ECF No. 1, at PageID.5; *id.* ("The Center's Oceans

Program focuses specifically on conserving marine ecosystems and seeks to ensure that

imperiled species are properly protected from destructive practices in our oceans.");

ECF No. 44-5 (Kristen Monsell Decl.).

Moreover, the Center has submitted declarations from several members, which

lay out why they would have standing to sue on their own behalf. *See generally* ECF

Nos. 44-2 to 44-4. The members say that they have previously snorkeled and dove in

Indo-Pacific and Caribbean waters, during which they enjoyed observing the diversity

of coral reefs, and that they have concrete plans to return to those areas. *See, e.g.*, ECF

No. 44-2, at PageID.16277-79 (Brett Hartl Decl.) (stating that declarant has travelled

extensively in Indonesia, among other places, during which he snorkeled, dove, and

enjoyed observing the diversity of coral reefs, and that he has "concrete plans" to return

to the Indo-Pacific in 2025); ECF No. 44-3, at PageID.16284-87 (Elise Pautler Bennett

Decl.) (explaining that declarant annually visits the Florida Keys to snorkel and dive

amongst coral reefs; that when she does so, she attempts to identify listed coral species

and enjoys their diversity; and that observing a healthy coral reef is a "spiritual"

experience for her); ECF No. 44-4, at PageID.16298-301 (Abel Valdivia Decl.) (stating

that declarant is a marine biologist and frequently travels for work to locations with

coral reefs, snorkels and dives, monitors coral, and attempts to identify coral to species,

particularly those listed under the ESA; that declarant also enjoys swimming on coral

reefs for recreation; and that declarant had plans to go to Mexico and Fiji in 2024).  At

least one member describes how climate change has already had a negative impact on

his personal and professional enjoyment of corals.  *See* ECF No. 44-4, at PageID.16301-03

(Valdivia Decl.) (discussing the personal impact of observing and documenting dying

corals).  And each of the declarants explains how the ongoing threats to corals imperil

their continued observation and enjoyment of coral reefs.  *See generally* ECF Nos. 44-2 to

-4.  *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (holding that an injury

in fact must generally be "concrete, particularized, and actual or imminent" (internal

quotation marks omitted)).

These injuries have a causal connection to NMFS's decision not to promulgate regulations to protect the threatened corals.  Should the Court find in the Center's favor, moreover, the injuries are likely redressable through remand of the petition for the agency's further consideration of whether to adopt protective regulations.  The Court is therefore satisfied that at least one of the Center's members would have standing to sue on their own behalf.  Finally, while the members *could* do so, their participation is not *required* to dispose of the Center's APA claim or for the Court to grant the requested relief of remand.

For these reasons, the Court is satisfied that it has the authority to hear the Center's claim, and it now turns to the summary judgment motions before it.

### B.    Legal Standards for the Denial of a Petition for Rulemaking

In general, summary judgment is warranted where a movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Summary judgment "is a particularly appropriate tool for resolving claims challenging agency action."  *Ctr. for Biological Diversity v. Haaland*, 562 F. Supp. 3d 68, 76 (D. Ariz. 2021).  That is because in administrative agency cases, "the district court's role is not to resolve facts, but to 'determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  *Id.* (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

11

The parties sharply clash over what standard of review the Court should apply
to NMFS's decision in making this legal determination.  That said, they agree on the
basics of the standard—that is, they agree that the Court reviews the denial of a petition
for rulemaking under the APA.  And they acknowledge that the APA requires a court
to "hold unlawful and set aside agency action, findings, and conclusions" that are
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."
5 U.S.C. § 706(2)(A).  While one line in NMFS's brief suggests otherwise, *see* ECF No. 46-
1, at PageID.16334 ("[T]he question for the Court is *not* whether NMFS's decision to
decline to issue protective regulations under Section 4(d) was arbitrary and capricious,
but whether NMFS's denial of [the Center's] petition complied with the APA's
requirement to provide a brief statement of the grounds for denial." (cleaned up)),
NMFS ultimately recognizes that some version of the arbitrary and capricious standard
controls, *id.* at PageID.16332-33.

The parties diverge, however, in their views on how the "arbitrary and
capricious" standard should be applied.  NMFS emphasizes that courts' review of
petitions for rulemaking is "extremely limited" and the standard must be applied in a
"highly deferential manner."  *Id.* at PageID.16333-34 (citing *Massachusetts v. EPA*, 549
U.S. 497, 527-28 (2007)).  The Center, for its part, acknowledges the "high level of
deference" required in matters of agency expertise, but counters that the standard is not
"toothless."  ECF No. 47, at PageID.16361 (cleaned up).

The Court need not take a side in the parties' debate, for there is truth in each of their positions.  In *Massachusetts v. EPA*, the Supreme Court confirmed that "[r]efusals to promulgate rules are . . . susceptible to judicial review, though such review is," as NMFS presses, "extremely limited and highly deferential."  549 U.S. at 527-28 (internal quotation marks omitted).  At the same time, a court's review must not be toothless.  To survive judicial review, a denial of a petition for rulemaking must, at minimum, include a "brief statement of the grounds for denial," 5 U.S.C. § 555(e), with a "reasoned explanation," *Massachusetts*, 549 U.S. at 534.  In other words, an agency must, "at a minimum, clearly indicate that it has considered the potential problem identified in the petition and provide a 'reasonable explanation as to why it cannot or will not exercise its discretion' to initiate rulemaking."  *Compassion Over Killing v. FDA*, 849 F.3d 849, 857 (9th Cir. 2017) (quoting *Massachusetts*, 549 U.S. at 533).

In assessing whether an agency has provided a reasonable explanation, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted), nor may it accept post-hoc rationalizations, *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (citing *State Farm*, 463 U.S. at 50).  But a court must be mindful that "an agency's refusal to institute rulemaking proceedings is at the high end of the range of levels of deference we give to agency action under our arbitrary and capricious review,"

*Compassion Over Killing*, 849 F.3d at 854 (cleaned up), and it may affirm "a decision of less than ideal clarity if the agency's path may reasonably be discerned," *State Farm*, 463 U.S. at 43.

With these standards in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

### C.    NMFS's Decision to Not Extend Section 9's Prohibitions on Collection and Trade of the Corals Was Not Arbitrary and Capricious

The Center first challenges NMFS's denial of its request to adopt Section 9's prohibitions on the collection and trade of the threatened corals. Because NMFS laid out a brief statement with a reasoned basis for its denial, the Court defers to NMFS's determination that such an adoption was not necessary and advisable.

As explained above, Section 9 of the ESA prohibits the import, export, take, and sale of endangered species. 16 U.S.C. § 1538(a)(1). But those protections do not automatically extend to species designated as threatened rather than endangered. *See id.* Instead, for threatened species, the ESA offers the two-faceted protection of Section 4(d): (1) the requirement that NMFS issue regulations deemed necessary and advisable to provide for the species' conservation and (2) the option to extend Section 9's prohibitions. *Id.* § 1533(d); *see also Cal. State Grange v. Nat'l Marine Fisheries Serv.*, 620 F. Supp. 2d 1111, 1200 (E.D. Cal. 2008) ("Section 4(d) gives NMFS the discretion to extend or not extend take protections as deemed necessary for the conservation of such species." (cleaned up)). The Center emphasizes that NMFS has acknowledged that

14

coral is considered a nonrenewable resource, ECF No. 44-1, at PageID.16250, and that

while collection is largely banned within its borders, the United States is its largest

importer, *id.* at PageID.16261 (citing 79 Fed. Reg. 53852, 53902, ECF No. 30, at

PageID.1205 (AR at 1065)); the Center's petition thus posited that extending Section 9

prohibitions to the threatened corals was necessary and advisable.

NMFS considered the Center's request and provided a "brief statement"

explaining its decision not to extend Section 9's prohibitions to the threatened species.

Specifically, NMFS's letter denying the petition determined that such a rule would "not

meaningfully further the conservation of the species."  ECF No. 38-35, at PageID.14541

(AR at 15263).  Critically, NMFS did not merely offer a conclusory assertion that Section

9 prohibitions would be of no meaningful value.  Instead, it offered several *reasons* for

why it reached that conclusion.  For one, it explained that "collection and trade is

considered to be a minor source of take of these coral species" and "pose[s] a low-level

threat that minimally contributes to the extinction risk of these threatened corals."  *Id.*

And for the Caribbean corals in particular, NMFS explained that the prohibitions would

not meaningfully contribute to their conservation because their trade is already largely

prohibited throughout much of the Caribbean.  *Id.*  Moreover, for the Indo-Pacific

corals, the letter went on to identify another reason for declining to adopt the

prohibitions:  "[M]ost of the [fifteen] Indo-Pacific listed corals are difficult to identify to

species, even for Indo-Pacific coral experts," and so it is difficult to train "non-experts,

15

such as law enforcement personnel who would be responsible for the identification of the listed corals." *Id.* at PageID.14541-42 (AR at 15263-64). For that reason, such a rule would "frustrate" NMFS's "outreach efforts and enforcement activities." *Id.*

The Center nonetheless contends that NMFS's proffered justifications are arbitrary and capricious. With its highly deferential standard of review in mind, the Court considers each justification in turn.

1. In concluding that trade restrictions would provide "no meaningful conservation benefit" because collection and trade is a "minor source of take" that "pose[s] a low-level threat" to the corals, NMFS cited to its final listing rule, which drew the same conclusion based on a scientific report. *Id.* (citing 79 Fed. Reg. 53852, 53903, ECF No. 30, at PageID.1207 (AR at 1067)); *see also* ECF No. 29-3, at PageID.255 (AR at 115). According to the Center, the underlying report stated that "[i]n comparison with [other] factors, and climate change, the adverse but localized effects of the international coral trade are tiny," but went on to say that comparison is "hardly cause for satisfaction," as trade in *some* species is "probably not" sustainable. ECF No. 44-1, at PageID.16264. But, as NMFS points out, the final listing rule acknowledged the same concern. *See* 79 Fed. Reg. 53852, 53903, ECF No. 30, at PageID.1207 (AR at 1067) (raising "serious questions" about the "sustainability of the ornamental trade"). And yet after considering various other factors, NFMS still concluded that the overall threat level of collection and trade was low, particularly in comparison to other threats to the species.

16

*Id.* at 53900-03, ECF No. 30, at PageID.1204-07 (AR at 1064-67).  While NMFS's letter

could have engaged with the sustainability of trade in greater detail, the Court will not

second guess NMFS's judgment about the threat level of collection and trade, for it did

not fail to consider the problem of sustainability and is grounded in the available data.

Looking to the data, the Center specifically contests NMFS's determination that

"none of the species in [the] final rule can be characterized" as "special cases" for which

impacts from trade are higher.  ECF No. 44-1, at PageID.16264-65 (first quoting 79 Fed.

Reg. 53852, 53885, ECF No. 30, at PageID.1189 (AR at 1049); and then quoting ECF No.

29-3, at PageID.175 (AR at 35)).  The final listing rule and underlying report stated that

impacts from trade are *generally* low, except in some special cases, such as where species

have "severely depleted population levels," "naturally low abundance," 79 Fed. Reg.

53852, 53885, ECF No. 30, at PageID.1189 (AR at 1049), "restricted geographic or habitat

ranges," or "have already undergone precipitous population declines such that these

local threats further contribute to depensatory processes," ECF No. 29-3, at PageID.175

(AR at 35).  The Center connects that exception with a finding in NMFS's final listing

rule that some of the threatened corals are "rare" with "uncommon" abundance—in

particular, *Euphyllia paradivisa* and certain *Acropora* species.  ECF No. 44-1, at

PageID.16264-65.  And it further points out that the final listing rule concludes that

*Euphyllia paradivisa* "is likely to have *high* susceptibility" to collection and trade.  79 Fed.

Reg. 53852, 54115, ECF No. 30, at PageID.1419 (AR at 1279) (emphasis added).

17

NMFS retorts that even those coral species—which it has determined to be "rare" with "uncommon" abundance—are, when considered in scale, still minimally threatened by collection and trade.  That is because even "uncommon" or "rare" coral species "may have millions of colonies."  ECF No. 46-1, at PageID.16337-38.  For example, when the Center's petition noted that 3,587 specimen of *Euphyllia paradivisa* were documented as exported to the United States in 2014, NMFS's denial letter considered that concern but explained that the overall population of that species is "at least several tens of millions of colonies."  ECF No. 38-35, at PageID.14541 (AR at 15263).  That conclusion is consistent with findings from NMFS's listing rule.  *See, e.g.*, 79 Fed. Reg. 53852, 54114, ECF No. 30, at PageID.1418-19 (AR at 1278-79) ("The [Status Review Report] and [Supplemental Information Report] reported that *E. paradivisa*'s abundance is uncommon. . . . [B]ased on results from Richards *et al.* (2008) and Veron (2014), the absolute abundance of this species is likely at least tens of millions of colonies.").

Moreover, although the final listing rule rated *Euphyllia paradivisa*'s susceptibility to collection and trade as "high," *id.*, ECF No. 30, at PageID.1419 (AR at 1279), it also explained that susceptibility to a threat does not necessarily equate to vulnerability, *id.* at 53886-87, ECF No. 30, at PageID.1190-91 (AR at 1050-51).  That may be the case, for example, "if exposure is low over the appropriate spatial and temporal scales."  *Id.*; *see also id.* at 53903, ECF No. 30, at PageID.1207 (AR at 1067) ("The impact of collection and

trade may be mediated by several factors and the extent to which the extinction risk of a

coral species is impacted by collection and trade depends on its particular level of

susceptibility, *combined with its spatial and demographic characteristics . . . .*" (emphasis

added)).  The final listing rule considered numerous particular characteristics of

*Euphyllia paradivisa*, including its absolute abundance.  *Id.* at 54114-17, ECF No. 30, at

PageID.1418-21 (AR at 1278-81).  The listing rule separately explained that while threats

like trade "can be locally acute . . . because they affect limited geographic areas, they are

[nonetheless] of low importance when evaluating extinction risk."  *Id.* at 53885, ECF No.

30, at PageID.1189 (AR at 1049).  And, consistent with the explanation set forth in

NMFS's denial letter, the listing rule ultimately concluded that none of the listed species

fall into an exception—that is, collection and trade is still a low threat level for each of

them.  *Id.*  Because that explanation is based in the scientific evidence regarding the

prevalence and specific circumstances of the threatened species, the Court will not

second guess it.

The Center further rejoins that NMFS's cited numbers do not account for the full

picture of the impact caused by trade of the species.  ECF No. 47, at PageID.16368-69.  It

points out that trade statistics rarely identify coral to species, that a significant portion

of imports go undocumented in the black market, and that even more coral is destroyed

in the wild to produce the coral that is imported.  *Id.*  NMFS is correct, however, that its

denial letter's reliance on the final listing rule in concluding the threat level is low is

sufficient to belie this concern, for the final listing rule considered the total number of

stony corals collected worldwide, undocumented and illegal trade, and harvest damage

before concluding that collection and trade posed only a low-level threat.  79 Fed. Reg.

53852, 53901-03, ECF No. 30, at PageID.1204-07 (AR at 1064-67).

    2.  For the threatened Caribbean species in particular, NMFS's denial letter

further explained that import levels are low because collection and trade for commercial

purposes is already largely prohibited throughout the Caribbean.  ECF No. 38-35, at

PageID.14541 (AR at 15263).  The Center does not seriously dispute that this is true.

Instead, the Center argues that "[u]nder identical circumstances," NMFS has still found

it to be necessary and advisable to ban the import of other Caribbean corals—namely,

elkhorn (*Acropora palmata*) and staghorn (*A. cervicornis*) corals—because "increased

public exposure . . . due to the ESA listing may make the species more desirable for

aquaria."  ECF No. 47, at PageID.16371 n.5 (quoting 73 Fed. Reg. 64264, 64270 (Oct. 29,

2008)).  By extension, the Center argues, it was arbitrary for NMFS to reach the opposite

conclusion regarding the twenty coral species at issue here.  ECF No. 44-1, at

PageID.16265-66.

    In *California State Grange*, the district court in the Eastern District of California

rejected an argument by a party petitioning for regulations to protect threatened

California steelhead that NMFS arbitrarily distinguished between "naturally-spawned"

fish, to which it extended Section 9 prohibitions, and "hatchery-born" fish, to which it

did not.  620 F. Supp. 2d at 1199-202.  The petitioner argued that it was arbitrary to have "two genetically identical fish swimming side-by-side in the same stream," only one of which "receives ESA protection."  *Id.* at 1202 (cleaned up).  But the district court determined that NMFS's distinction between the two groups of fish was based on undisputed scientific reasoning that the hatchery fish could reduce the viability of the wild fish.  *Id.*

Here, NMFS contends that its contrary decisions regarding elkhorn and staghorn corals (to which it extended Section 9 prohibitions without evidence of take or import) versus the twenty listed coral species at issue here (to which it did not extend Section 9 prohibitions) were not arbitrary because they were based on its determination of the best way to avoid harmful trade.  For the elkhorn and staghorn corals, NMFS extended Section 9 prohibitions based on its belief that the ESA listing might encourage trade of the previously untraded species.  ECF No. 46-1, at PageID.16338 n.6 (citing 73 Fed. Reg. 64264, 64270-71).  NMFS's reasoning there stated that "increased public exposure to these rare corals due to the ESA listing may make the two species more desirable for aquaria."  73 Fed. Reg. 64264, 64270.  For the twenty threatened species here, on the other hand, in a 2015 memorandum, NMFS found that "'*not* regulating trade' would avoid the potential for creation of a black market for these species which were already in trade, albeit minimally."  ECF No. 46-1, at PageID.16338 n.6 (quoting ECF No. 30, at PageID.1455-56 (AR at 1315-16)).

To be sure, NMFS's answer is not altogether satisfying.  One could rationally conclude that these market dynamics apply to both groups of corals:  listing a species without regulating its trade might make it more desirable, but regulating its trade might open the door for the creation of a black market.  As in *California State Grange*, however, the Center does not dispute the underpinnings of NMFS's determination—namely, that NMFS's predictions are legitimately grounded in the relevant factual circumstances.  And it is plausible that such a judgment call might reasonably change depending on whether a species was already in trade distribution—a fact that NMFS expressly relied on in a prior memorandum.  Accordingly, the fact that collection and trade for commercial purposes is already largely prohibited throughout the Caribbean serves as another reasonable basis for the Center's determination that extending Section 9's prohibitions—at least to the Caribbean species—is not necessary and advisable.

3.  Next, for the threatened Indo-Pacific corals, NMFS's denial letter separately explained that collection and trade restrictions would provide "no meaningful conservation benefit" because the Indo-Pacific corals are difficult to identify to species. ECF No. 38-35, at PageID.14541-42 (AR at 15263-64).  As a result, they are "easily confused with a large number of similar, unlisted species."  *Id.* at PageID.14541 (AR at 15263).  NMFS therefore concluded that a rule prohibiting trade would "frustrate [its] outreach efforts and enforcement activities."  *Id.* at PageID.14542 (AR at 15264).  On summary judgment, the Center argues that the record contradicts this conclusion

because many of the listed corals have only "low" or "moderate" "Species ID Uncertainty," coral identification is improving, international law already requires at least one of the listed corals to be identified to a species level, and there is no support for NMFS's statement that extending Section 9 would "frustrate [its] outreach and enforcement activities."  ECF No. 44-1, at PageID.16266-69.

As an initial matter, NMFS's determination that trade prohibitions would "frustrate" its outreach efforts and enforcement activities is clearly based on its concern that corals are difficult to identify.  In its letter declining to extend Section 9 prohibitions to the corals, NMFS explained that because coral species can be difficult to identify even for experts, it would be especially difficult to train "non-experts, such as law enforcement personnel who would be responsible for the identification of the listed corals."  ECF No. 38-35, at PageID.14542 (AR at 15264).  The sufficiency of the outreach and enforcement justification, therefore, turns simply on the validity of NMFS's determination that Indo-Pacific corals are difficult to identify.

The parties point to the same evidence underlying NMFS's conclusion:  Two of the threatened Indo-Pacific species—*Euphyllia paradivisa* and *Pavona diffluens*—are ranked as "low" "Species ID Uncertainty."  ECF No. 34, at PageID.2672-83 (AR at 2532-43).  The majority are classified as "moderate."  *Id.*  And a few fall into the "high" uncertainty group.  *Id.*  As the Center notes, even the species with "low" "Species ID Uncertainty" are categorized as such because "*trained marine biologists* familiar with

Indo-Pacific reef-building coral ID can readily identify" them.  ECF No. 44-1, at

PageID.16267 n.4 (emphasis added) (quoting ECF No. 34, at PageID.2672 (AR at 2532)).

It follows that even for the two species that tend to be more readily identifiable for

marine biologists, law enforcement may not be able to readily identify them—at least

not without significant training.

The Center suggests that NMFS now offers such training.  Since the 2014 listing

rule, NMFS has implemented conservation measures through hosting species

identification workshops.  *Id.* at PageID.16267.  And a 2016 report prepared after an

initial workshop explained that, while identification is still challenging, "most colonies

of listed species have typical characteristics that can form the basis for fairly reliable,

consistent identification."  *Id.* (quoting ECF No. 38-11, at PageID.7014 (AR at 6868)).

Further, through the program, NMFS has distributed identification guides, and even

identification of species through DNA sequencing has become increasingly available.

*Id.* (citing ECF No. 38-27, at PageID.9962 (AR at 9816)).  NMFS's denial letter

acknowledged that "progress is being made," and yet, consistent with the report, still

maintained that "the training program has illustrated the difficulty of training non-

experts."  ECF No. 38-35, at PageID.14542 (AR at 15264).  And while DNA sequencing

was not specifically raised in the Center's petition, pointing to the same underlying

report, NMFS now responds that "[e]ven if DNA sequencing could identify specimen to

the species level . . . it would be impractical time- and resource-wise for law

enforcement to DNA sequence each coral specimen that comes through customs."  ECF

No. 46-1, at PageID.16339 (citing ECF No. 38-27, at PageID.9962 (AR at 9816)).  It may

well be that NMFS's commendable training efforts will eventually allow for more

effective enforcement of potential import restrictions on these corals, if such restrictions

are deemed necessary and advisable in the future.  But for the time being, it suffices to

say that it was within NMFS's discretion to rely on the well-documented challenges to

species identification in deciding not to extend Section 9's prohibitions to the threatened

species.

One of the Center's arguments on this issue, however, holds merit.  The Center

posits that international law "*already* requires that at least one of the listed species,

*Euphyllia paradivisa*,"—one of the two "low" identification uncertainty species—"be

identified to species level to be traded."  ECF No. 44-1, at PageID.16268 (emphasis

added).  Due to trade concerns, the Convention on International Trade in Endangered

Species (CITES) requires permits for all exports of *Euphyllia paradivisa* and, to that end,

requires the corals to be identified to a species level.  *Id.* (citing CITES art. IV(2), Mar. 3,

1973, 27 U.S.T. 1087).  For that reason, the Court agrees that identification challenges are

not a reasoned basis for declining to regulate the trade of *Euphyllia paradivisa*.

But even assuming—without deciding—that the same could be said of the other

"low" identification-uncertainty species, *Pavona diffluens*, identification challenges

remain a reasoned basis for deciding not to regulate trade of the other species.  And

even as to *Euphyllia paradivisa* and *Pavona diffluens*, the letter offers other justifications, as explained above, that suffice to backstop NMFS's decision not to extend Section 9's prohibitions.

For these reasons, the Court cannot find that NMFS's denial of the Center's petition to extend Section 9's collection and trade prohibitions to the threatened corals was arbitrary and capricious.

> **D.    NMFS's Decision to Not Adopt Additional 4(d) Regulations to Address Climate Change and Localized Threats Was Arbitrary and Capricious**

The Center separately challenges NMFS's denial of its petition to adopt additional Section 4(d) regulations to address climate change and localized threats such as overfishing, water pollution, and habitat degradation. Here again, the Court employs a highly deferential standard of review. Even under that standard, however, the Court concludes that NFMS did not adequately anchor parts of its decision with a reasonable explanation.

> **1.    Climate Change**

In stark contrast to collection and trade, which NMFS identified to be a "low level" threat, NMFS itself has found climate change to be the single greatest threat to the threatened coral species. *See e.g.*, 79 Fed. Reg. 53852, 53887, ECF No. 30, at PageID.1190 (AR at 1050) ("[T]he threats related to global climate change . . . pose the greatest potential extinction risk to corals . . . ."). In its final listing rule, NMFS found that greenhouse gas emissions, for example, "increas[e] the warming of the global

climate system and alter[] the carbonate chemistry of the ocean . . . which affects a number of biological processes in corals." *Id.* Indeed, as the Center points out, NMFS has previously stated that greenhouse gas emissions *must* be reduced for the conservation of threatened corals. ECF No. 44-1, at PageID.16257 (citing ECF No. 38-28, at PageID.10748, 10788-94 (AR at 10602, 10642-48) (NMFS's 2015 Recovery Plan for Elkhorn & Staghorn Corals)).

Yet in its denial letter, NMFS professed that the requested regulations were not necessary and advisable to promote the conservation of the threatened corals. In reaching this conclusion, it is worth noting what NMFS did *not* say. NMFS did not conclude that it lacked the legal authority to adopt Section 4(d) regulations to address climate change. *Cf. Compassion Over Killing*, 849 F.3d at 854-55 (affirming the judgment of two agencies that concluded they lacked the authority to promulgate the requested regulation). Nor did it say that it was unaware of what Section 4(d) regulations it might adopt to accomplish those ends, or that the Center's petition suffered from a lack of clarity. *Cf. Advanced Integrative Med. Sci. Inst., PLLC v. U.S. Drug Enf't Admin.*, No. 22-1568, 2025 WL 481582, at *8 (9th Cir. Feb. 13, 2025) (cleaned up) (holding that agency's "reliance on the lack of clarity" in a request was not arbitrary and capricious). NMFS did not find that it would consume an inordinate amount of agency resources to promulgate regulations, or that it lacked the institutional competence or resources to do so. *Cf. Compassion Over Killing*, 849 F.3d at 856 (accepting the Federal Trade

27

Commission's explanation that, "in light of the numerous statutory requirements for rulemaking under the [Federal Trade Commission Act], the resource commitment necessary to adopt a rule similar to what Plaintiffs requested would be considerable" (internal quotation marks omitted)).  And finally, NMFS did not say that it was studying the problem or that it needed more time to assess whether Section 4(d) regulations are needed.  *Cf. Food & Water Watch v. U.S. Env't Prot. Agency*, No. 23-2146, 2024 WL 4371122, at *2 (9th Cir. Oct. 2, 2024) (accepting the Environmental Protection Agency's explanation that it "deemed it prudent to first seek information about how best to tackle the problem before directing resources toward a new rulemaking").

Instead, NMFS offered three conclusory assertions to support the denial of the Center's petition for rulemaking:

*First*, for the Indo-Pacific corals, NMFS asserted that "a section 4(d) rule would likely have limited effectiveness in addressing [climate change] or meaningfully furthering the conservation of" the threatened coral species.  ECF No. 38-35, at PageID.14542 (AR at 15264).

*Second*, it asserted that interagency consultation under Section 7 of the ESA, as well as "engaging with partners, both within and outside the United States, to develop, finalize, and implement recovery plans for these species is a high priority and a more effective way to address ongoing threats to these species."  *Id.*

28

*Third*, NMFS asserted that promulgating a Section 4(d) rule to address climate change "would take resources away from the higher priorities of completing critical habitat designations, completing a recovery plan, and improving identification of these species through training and outreach." *Id.*

The question is whether these three assertions, taken individually or together, are sufficient to show that the agency "clearly indicate[d] that it has considered the potential problem identified in the petition and provide[d] a reasonable explanation as to why it cannot or will not exercise its discretion to initiate rulemaking." *Compassion Over Killing*, 849 F.3d at 857 (internal quotation marks omitted).

  a. Begin with NMFS's bald assertion that Section 4(d) regulations addressing climate change would have only a "limited" effect in addressing climate change or meaningfully promoting conservation of the threatened coral species.

This proffered justification fails to offer any reasoned explanation for why Section 4(d) regulations are not necessary and advisable to promote conservation, as required by 16 U.S.C. § 1533(d). Given the scale and complexity of climate change, it is undoubtedly true that *any* regulation addressing it would have at most a "limited" effect in addressing the problem. Indeed, at the hearing on the pending cross-motions for summary judgment, counsel for NMFS candidly acknowledged that each of the measures NMFS is actively pursuing to address climate change—activities the agency presumably believes are necessary and advisable—will at most have a limited effect.

29

To say that a Section 4(d) regulation would have only a "limited" effect on addressing climate change, then, does not explain why it is not still necessary and advisable to enact that regulation. A collection of limited effects can, after all, add up to something more significant. And since NMFS itself has recognized climate change as the most significant threat to the continued survival of the listed coral, some explanation—beyond the unremarkable point that any regulation, on its own, would only move the ball a few yards down the field—is needed for why these limited effects are not necessary and advisable to promote the conservation of these imperiled species.

NMFS resists this conclusion as a mere exercise in semantics or an unfairly literal interpretation of the agency's denial letter. In its briefing and at the hearing on the pending motions, counsel for NMFS contended that this aspect of the denial letter should be construed charitably as having implicitly found that Section 4(d) regulations addressing climate change would have not just a limited effect, but no meaningful effect at all.

This argument faces at least two problems, the first being that NMFS's denial letter said no such thing. And it is not as if NMFS was unaware of how to communicate its view that a regulation would have no meaningful effect. After all, that is precisely what it said about the possibility of extending Section 9 prohibitions to the threatened corals. *See* ECF No. 38-35, at PageID.14541 (AR at 15263) (finding that extending Section 9 prohibitions would "not meaningfully further the conservation of the species"). In the

context of additional Section 4(d) protections, by contrast, NMFS stated that "[f]or the
Indo-Pacific corals, we find that a section 4(d) rule would likely have limited
effectiveness in addressing these threats or meaningfully furthering the conservation of
these species." *Id.* at PageID.14542 (AR at 15264).  That is to say, NMFS found that a
Section 4(d) rule would have "limited effectiveness" in addressing climate change
threats.  *Id.*  NMFS further found that such a rule would have "limited effectiveness" in
"meaningfully furthering the conservation of these species."[2]  *Id.*  What NMFS's letter
did not find—or at least did not say it found—was that the requested rule would have
no "meaningful effect" at all on those fronts.  And given this record, NMFS's choice of
the word "limited" appears to have been deliberate.

Granted, this Court may affirm "a decision of less than ideal clarity if the
agency's path may reasonably be discerned."  *Advanced Integrative Med. Sci. Inst.*, 2025
WL 481582, at *7 (cleaned up).  And perhaps the charitable interpretation proffered by
NMFS's counsel might be reasonably—even if not inevitably or most naturally—
discerned from NMFS's less-than-clear denial letter.  But a second, more substantive
problem would arise if the Court were to construe NMFS's denial letter as having
altogether dismissed the effectiveness of Section 4(d) regulations to address climate

---

[2]    In this sentence, the phrase "limited effectiveness" clearly modifies the latter
phrase "meaningfully furthering the conservation of species."  ECF No. 38-35, at
PageID.14542 (AR at 15264).  If it did not, the sentence would incomprehensibly read, in
relevant part:  "a section 4(d) rule would likely have . . . meaningfully furthering the
conservation of these species."  *See id.*

change:  the denial letter offers no reason for *why* NMFS might have reached that

conclusion.  Put differently, the Court would have "no basis in the record for

determining *why* [NMFS] believes that or how it arrived at that conclusion."  *Coinbase,*

*Inc. v. SEC*, 126 F.4th 175, 200 (3rd Cir. 2025).  Such an explanation "is not slim—it is

vacuous."  *Id.* (internal quotation marks omitted).  It is "of the conclusory variety that

courts have previously rejected as insufficient to sustain an agency's refusal to initiate a

rulemaking."  *Id.* (cleaned up) (quoting *Env't Health Tr. v. FCC*, 9 F.4th 893, 904-05 (D.C.

Cir. 2021)).  A vacuous explanation of that type does not satisfy an agency's obligation

to provide "a reasonable explanation as to why it cannot or will not exercise its

discretion to initiate rulemaking."  *Compassion Over Killing*, 849 F.3d at 857 (internal

quotation marks omitted).

        This is not to say that NMFS necessarily needs to cite directly-on-point data or

studies to conclude that a proposed regulation would have no discernable effect in

addressing a problem.  It may well be—though, of course, the Court does not now

decide—that there is no such available data, and that the agency must reason by

analogy or otherwise employ its technical and scientific expertise to make a rough

prediction about the likely effectiveness of any given regulation.  Or it may be that an

agency reasonably decides to seek out additional data before making a decision.  *See*

*Food & Water Watch*, 2024 WL 4371122, at *2.  The problem is that NMFS's denial letter

says nothing about why (or how) it might have judged the proposed Section 4(d)

regulations to be as ineffective as it (supposedly) did. This Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *State Farm*, 463 U.S. at 43. Because NMFS has not adequately stated the reasons for its conclusion, the Court cannot defer to them.

       b.   NMFS's second assertion is that interagency consultation and engaging with partners to implement recovery plans for the threatened corals "is a high priority and a more effective way to address ongoing threats to these species." ECF No. 38-35, at PageID.14542 (AR at 15264). This assertion fares no better than the first.

       Recall that the question under Section 4(d) is whether NMFS deems any proposed protective regulation "necessary and advisable" for the conservation of a threatened species. And since a wide variety of Section 4(d) regulations, each with a limited effect, might, collectively, make progress in solving a large problem, one might also conclude that a wide variety of Section 4(d) regulations might *all* be necessary and advisable—even if some are more outstanding or promising than others.

       In its denial letter, NMFS asserts that its current activities are a "high priority" and a "more effective" way to promote the conservation of the threatened corals. *Id.* That may well be—and, indeed, the Court must defer to NMFS's judgment that they are. But NMFS's assertion does not answer the question of why the proposed Section 4(d) regulations are not *also* necessary and advisable. That is because NMFS does not, of course, suggest that its ongoing efforts have any chance of completely solving the

challenge of climate change.  There is still room to do more, even if NMFS has identified

its current course as the most promising one.  *See Defs. of Wildlife v. Andrus*, 428 F. Supp.

167, 170 (D.D.C. 1977) (explaining that the goal of "conservation" requires an agency to

"do far more than merely avoid the elimination of protected species.  It must bring

these species back from the brink so that they may be removed from the protected class,

and it must use all methods necessary to do so.  The Service cannot limit its focus to

what it considers the most important management tool available to it, i.e., habitat

control, to accomplish this end.").  And so NMFS must offer a *reason* for why it has

concluded that Section 4(d) regulations are not themselves necessary and advisable.

Merely asserting that it prefers to focus on other efforts, standing alone, is not sufficient.

      c.  NMFS's third and final justification for denying the proposed Section

4(d) regulations to address climate change is that promulgating such regulations would

"take resources away from the higher priorities" that NMFS represents it is currently

pursuing.  ECF No. 38-35, at PageID.14542 (AR at 15264).  This last assertion—taken

together with the first two—comes the closest to offering a reasoned explanation for

NMFS's denial of the petition.  But it, too, ultimately comes up short.

    The Ninth Circuit has recognized that an "agency's decision to prioritize other

projects is entitled to great deference by a reviewing court."  *Compassion Over Killing*,

849 F.3d at 857.  That is because the agency "is in a unique—and authoritative—position

to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *Id.* (quoting *In re Barr Labs., Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991)).

But the Ninth Circuit has also cautioned that "such broad discretion should not be construed as providing a blanket exception to APA review in any matter involving the allocation of agency resources." *Id.*; *see also id.* ("We reject the suggestion that agency denials of requests for rulemaking are exempt from judicial review." (cleaned up)).  In *Compassion Over Killing*, for example, the Ninth Circuit found that the U.S. Food and Drug Administration had only "barely" met its burden for explaining the denial of a rulemaking petition where the agency expressed a preference for individual enforcement actions rather than the issuance of a broad regulation to address the problem of misbranded eggs.  *Id.* at 856-57.  One reason why the agency managed to survive judicial scrutiny, the Court explained, was that "[t]he decision to take enforcement action against misbranded eggs on a case-by-case basis, as opposed to promulgating regulations that would apply to all egg producers, is left to the broad discretion of the FDA." *Id.* at 857.

In this case, the question is not whether to address a problem at the wholesale (by regulation) or retail (through enforcement actions) level.  NMFS does not propose Section 4(d) enforcement actions in the place of Section 4(d) regulations.  The question, instead, is whether Section 4(d) regulations are necessary and advisable, with the alternative of no Section 4(d) action at all.  And if the FDA "barely" survived judicial

35

scrutiny in *Compassion Over Killing*, it is difficult to see how NMFS can survive judicial scrutiny here.

To begin with, NMFS's denial letter says merely that adopting Section 4(d) regulations would "take resources away" from its current, higher priority activities. As with the "limited effectiveness" statement, that is a mere truism. All agencies have limited resources, and it is always the case that adopting any one regulation would take resources away from other activities an agency is engaged in. Were this unremarkable assertion sufficient to explain why a Section 4(d) regulation is not necessary and advisable, it would effectively "provid[e] a blanket exception to APA review in any matter involving the allocation of agency resources," *Compassion Over Killing*, 849 F.3d at 857—precisely what the Ninth Circuit warned against.

Here again, NMFS urges a more charitable, non-literal interpretation of NMFS's denial letter. According to NMFS's counsel, the denial letter should be understood as having determined that it would not be advisable to divert resources from higher priority projects because the amount of resources that would be required to promulgate and enforce a regulation are not justified in light of the limited effect that any such regulation would have. But once again, counsel's post hoc explanation runs into the dual problem that the agency said no such thing, and that even if it could be reasonably construed as having said that, its letter would be devoid of any explanation for *why* it might have reached this conclusion.

36

The Third Circuit's decision in *Coinbase, Inc.*, 126 F.4th 175, is instructive.  In that case, a petitioner challenged the Securities and Exchange Commission's denial of a petition to adopt regulations to address the application of federal securities laws to digital assets, such as cryptocurrencies.  *Id.* at 186-88.  The Third Circuit recognized that "[w]hen an agency explains its allocation of resources and ordering of regulatory priorities, courts ordinarily should not disturb that decision."  *Id.* at 201.  But the court cautioned—as the Ninth Circuit did in *Compassion Over Killing*—that "resource allocation is not a talisman that an agency may invoke to escape judicial review.  It is one explanation for agency inaction among many . . . [and] like any other explanation for agency action, it must be sufficiently reasoned."  *Id.*  Quoting language from *Compassion Over Killing*, the Third Circuit warned that "[i]f it were sufficient for an agency to assert that it has other priorities and then point generally, without further explanation, to all of its ongoing rulemakings, then this 'broad discretion' would become a 'blanket exception to APA review in any matter involving the allocation of agency resources.'"  *Id.* (quoting *Compassion Over Killing*, 849 F.3d at 857).  Because the agency did no more than offer a conclusory assertion about its priorities, the Third Circuit remanded to the agency for further explanation.  *Id.*

The D.C. Circuit's decision in *American Horse Protection Ass'n v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987), is similarly instructive.  There, the Secretary of Agriculture was presented with a petition for rulemaking concerning the deliberate injuring of show

horses to improve their performance.  *Id.* at 1-2.  In explaining why the petition was

denied, the agency Administrator noted that he had "reviewed studies and other

materials," and "[o]n the basis of this information, I believe that the most effective

method of enforcing" the statute at issue "is to continue the current regulations."  *Id.* at

5.  The D.C. Circuit found these "two conclusory sentences . . . insufficient to assure a

reviewing court that the agency's refusal to act was the product of reasoned

decisionmaking."  *Id.* at 6.  That is because there was "no articulation of the factual and

policy bases for the decision."  *Id.* (cleaned up).

Or consider the D.C. Circuit's more recent decision in *Environmental Health Trust*,

9 F.4th 893.  There, the D.C. Circuit remanded an agency's order denying a rulemaking

petition—which requested that the Federal Communications Commission modify its

existing guidelines for exposure to radiofrequency radiation—that was "bereft of any

explanation as to *why*, in light of the studies in the record, its guidelines remain

adequate."  *Id.* at 906.  "Were the APA to require less," the court warned, "our very

deferential review would become nothing more than a rubber stamp."  *Id.*

So too here.  NMFS's explanation that it has other priorities "may be a sufficient

basis for denying a rulemaking petition," but "it must do more than claim it has other

priorities."  *Coinbase, Inc.*, 126 F.4th at 201.  "At a minimum, it must explain *why* it is

prioritizing other . . . actions."  *Id.* (emphasis added).  Were the Court to allow

otherwise, it would reduce its limited review to a hollow formality.

In short, NMFS's denial letter did not offer the required explanation.  And

because NMFS failed to provide adequate reasons for its decision not to adopt Section

4(d) regulations to address climate change, the Court remands for either a "fuller

explanation of the agency's reasoning" or "for the agency to deal with the problem

afresh by taking new agency action."  *Aggarwal v. U.S. Drug Enf't Admin.*, No. 22-1718,

2023 WL 7101927, at *2 (9th Cir. Oct. 27, 2023) (quoting *Dep't of Homeland Sec. v. Regents

of the Univ. of Cal.*, 591 U.S. 1, 20-21 (2020)).[3]

### 2.    Localized Threats

There remains one final aspect of NMFS's denial letter to consider.  The agency

concluded that Section 4(d) regulations were not necessary and advisable to address

localized threats, such as overfishing, water pollution, and habitat degradation.  The

question is whether NMFS has offered adequate reasons for this conclusion.

1.  For the most part, NMFS's reasons for denying Section 4(d) regulations to

address localized threats mirror the reasons it gave for denying regulations to address

climate change; the letter does not clearly differentiate between the two.  NMFS

asserted that any such regulations would have only a limited effect, that it instead

---

[3]    The denial letter also references the global nature of the threatened Indo-Pacific corals—that is, the fact that many of them are not located in U.S. waters, ECF No. 38-35, at PageID.14542 (AR at 15264)—but that portion of the letter appears to be addressing localized threats, which the Court takes up next.  To the extent that passage was also meant to address climate change, NMFS has offered no explanation for why the location of the threatened corals would make Section 4(d) regulations any less necessary or advisable; surely any greenhouse gas reductions would have a necessarily global effect.

intends to pursue higher priority conservation efforts, and that adopting regulations would take resources away from its priorities.  Although the localized threats may not be as sprawling and daunting a challenge as climate change, it remains insufficient to merely assert that regulations would have a limited effect.  And NMFS did not offer any explanation for *why* that would be the case.  It likewise remains insufficient to merely assert that regulations would take resources away from other priorities.  NMFS needed to provide an explanation for *why* matters of resource allocation rendered Section 4(d) regulations not necessary and advisable.  And for the most part, it failed to do so.

Indeed, NMFS itself has in the past acknowledged that adopting a wide variety of measures is the best way to address the problem of localized threats.  To illustrate this point, the Center correctly points out that in a separate 2015 elkhorn and staghorn coral recovery plan, NMFS acknowledged that "[s]imultaneously, local threat reductions, mitigation strategies, *and in* and *ex situ* conservation and restoration actions must be pursued" to recover the corals.  ECF No. 38-28, at PageID.10748 (AR at 10602) (first emphasis added); *see also, e.g.*, 79 Fed. Reg. 53852, 53885, ECF No. 30, at PageID.1190 (AR at 1050) (acknowledging that localized threats have been "significant drivers of past coral reef species decline"); *id.* at 53862-63, ECF No. 30 at PageID.1166-67 (AR at 1026-27) ("[Protections from overfishing are] *essential* to coral reef ecosystem resilience in light of climate change-related threats." (emphasis added)).

40

2.  NMFS's denial letter offered one specific reason for not adopting Section 4(d)

regulations to address localized threats.  As noted, it concluded that the requested

regulations would have "limited effectiveness" in addressing localized threats to the

Indo-Pacific corals.  ECF No. 38-35, at PageID.14542 (AR at 15264).  And in this passage

of the denial letter, NMFS did not merely make a bald assertion, but instead provided a

reason why it had reached this conclusion:  eight of the fifteen listed Indo-Pacific corals

occur only outside of U.S. waters.  *Id.*  Additionally, within U.S. waters, most of the

activities causing incidental take of the Indo-Pacific corals are permitted, undertaken, or

authorized by other federal agencies—such as the military—and are therefore required

to go through interagency consultation pursuant to Section 7 of the ESA.  *Id.*

The Center correctly points out, however, that the letter's explanation for the

denial appears to cover only the *Indo-Pacific* corals.  The decision contains no similar

explanation for why the requested regulations would have a limited effect in

addressing local threats for the *Caribbean* corals.  And the Court will not "supply a

reasoned basis" for NMFS's decision that the agency itself did not itself proffer.  *State

Farm*, 463 U.S. at 43.  Accordingly, because the denial letter provides no other adequate

justification for its decision to not promulgate additional Section 4(d) regulations to

protect Caribbean coral species against localized stressors, that decision was arbitrary

and capricious as a matter of law.

As to this discrete part of NMFS's decision, too, the Court therefore remands for either a fuller explanation or reconsideration.  *See Aggarwal*, 2023 WL 7101927, at *2.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, ECF No. 44, is GRANTED IN PART AND DENIED IN PART and Defendants' Cross-Motion for Summary Judgment, ECF No. 46, is GRANTED IN PART AND DENIED IN PART. More specifically, the Court grants Plaintiff's motion with respect to NMFS's denial of the petition to adopt Section 4(d) regulations to address climate change and to address localized threats to the Caribbean corals.  To that same extent, Defendants' motion is denied.  In all other respects, Plaintiff's motion is denied, and Defendants' motion is granted.  The case is remanded to NMFS for further proceedings consistent with this opinion.  At this time, the Court declines to impose a deadline for NMFS to conduct these further proceedings on remand.

IT IS SO ORDERED.

DATED:  March 6, 2025, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 23-00306 MWJS-WRP; *Center for Biological Diversity v. National Marine Fisheries Service*, et al.; ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT